Jeffery J. Oven
CROWLEY FLECK PLLP
490 North 31st Street, Ste 500
P. O. Box 2529
Billings, MT  59103-2529
Telephone:  (406) 252-3441
Facsimile:  (406) 252-5292
joven@crowleyfleck.com

Richard Casey
CROWLEY FLECK PLLP
1667 Whitefish Stage Rd., Ste 101
P.O. Box 759
Kalispell, MT  59903-0759
Telephone:  (406) 752-6644
Facsimile:  (406) 752-5108
rcasey@crowleyfleck.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| EXXON MOBIL CORPORATION, a New Jersey corporation,<br><br>                     Plaintiff,<br><br>  vs.<br><br>NORTHWESTERN CORPORATION dba NORTHWESTERN ENERGY, a Delaware corporation,<br><br>                     Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1.  **NEGLIGENCE/GROSS NEGLIGENCE**<br>2.  **BREACH OF CONTRACT;**<br>3.  **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; AND**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff  Exxon Mobil Corporation ("ExxonMobil"), by and through counsel, states and alleges the following for its Complaint against Defendant NorthWestern Corporation dba NorthWestern Energy ("NWE"):

## NATURE OF THE CASE

1.     This action arises out of events that occurred at the ExxonMobil oil refinery located in Billings, Montana ("Billings Refinery" or "Refinery") beginning on January 25, 2014, through the present which resulted in refinery-wide electrical outages.  In causing the incidents, NWE negligently failed to exercise reasonable care in designing, constructing, managing, maintaining and operating its electrical system and breached its contractual and legal duty to provide reliable electric power to the Refinery, all of which resulted in substantial damage to ExxonMobil.

2.     NWE owns and operates two 50 kilovolt ("kV") lines, one originating from the NWE Billings Rimrock Substation (the "Rimrock Substation") and the other from the NWE Billings Steam Plant Substation (the "Steam Plant Substation").  In order to operate the Refinery, ExxonMobil relies upon electrical power delivered from both of these NWE lines.

3.     The Refinery, and the sophisticated equipment operated within the Refinery, requires reliable electric power in order to function safely and efficiently. ExxonMobil contracted with NWE in order to ensure that electric power would be delivered to the Refinery.

4.      NWE knew or should have known that reliable electric power is critical to Refinery operations, and that Refinery equipment operates under extremely high heat and pressure conditions.  NWE further knew or should have known that an unplanned power dip or outage at the Refinery can cause damage to Refinery equipment and create hazardous conditions.  Furthermore, NWE knew or should have known that unplanned power dips or outages can present significant danger to the safety, health and environment of the Refinery employees and members of the community, including the risk of explosions, fires, serious injury or death, and environmental releases resulting in potential regulatory exposure.

5.      Notwithstanding NWE's duty to exercise reasonable care in providing reliable electric service to the Refinery, and its knowledge of the potentially adverse effects of its failure to do so, NWE failed to act reasonably in the design, construction, management, maintenance and operation of its equipment and facilities, resulting in plant wide electrical interruptions to the Refinery beginning on January 25, 2014, and significant damage to ExxonMobil – damage that includes, but is not limited to, damage of some of the Refinery's sophisticated equipment (which is particularly sensitive to unexpected voltage dips), substantial lost profits from a Refinery shut down, compromised production schedules, and subsequent environmental issues throughout the surrounding community.

6.      This lawsuit is necessitated by NWE's refusal to accept responsibility for

its misconduct and to abide by its obligations as a service provider.

## THE PARTIES

7.      Plaintiff Exxon Mobil Corporation is a New Jersey Corporation having its principal place of business located at 5959 Las Colinas Boulevard, Irving, Texas 75039.  ExxonMobil was formed in 1999 as a result of the merger between Mobil Oil Corporation and Exxon Corporation.[1]  ExxonMobil's Billings Refinery has provided customers in the region, including Montana, Wyoming, Utah, Colorado, South Dakota, Washington and Idaho, with high quality gasoline, aviation fuels and other materials for more than 66 years.

8.      Exxon Mobil is informed and believes that Defendant NorthWestern Corporation dba NorthWestern Energy is a Delaware corporation having its principal place of business located at 3010 W. 69th Street, Sioux Falls, South Dakota 57108. Upon information and belief, in 2002, NorthWestern Corporation acquired the energy distribution and transmission business of the former Montana Power Company to form NWE.[2]  On its website (http://www.northwesternenergy.com), NWE represents that it delivers electricity to more than 416,100 customers daily in Montana, South Dakota, Nebraska and Wyoming, and its service territory covers approximately 107,600 square miles or about 73% of Montana's land area.

---

[1] For purposes of this Complaint, ExxonMobil, and its predecessors, Mobil Oil Corporation and Exxon Corporation, are hereafter collectively referred to as "ExxonMobil."
[2] For purposes of this Complaint, NWE, and its predecessor, the Montana Power Company, are hereafter collectively referred to as "NWE."

## JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)

because the parties are citizens of different states and the matter in controversy exceeds

$75,000 exclusive of interest and costs.

10.      This Court has personal jurisdiction over NWE because NWE resides in

this State, maintains offices in this State, does business in this State, has engaged in

acts or omissions within this State causing injury, and has otherwise established

contacts within this State making the exercise of personal jurisdiction proper.

11.      The claims asserted herein do not fall within the jurisdiction of the

Montana Public Service Commission.  In addition, ExxonMobil has submitted claims

to NWE in connection with the matters described herein.  Such claims and all other

attempts to resolve this dispute have been unreasonably rejected by NWE, thus

necessitating the filing of this action by ExxonMobil.

12.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2)

because NWE resides in this District pursuant to 28 U.S.C. § 1391(c), and a substantial

part of the events or omissions giving rise to the action occurred in this District.

## FACTUAL BACKGROUND

### Background Regarding the Billings Refinery and
### Relationship Between ExxonMobil and NWE

13.      For more than six decades, ExxonMobil's Billings Refinery has provided

customers throughout the region, including Montana, Wyoming, Utah, Colorado, South Dakota, Washington and Idaho, with high quality gasoline and similar products. Since the Refinery's beginning, it has been a premier facility distributing refined products such as gasoline and diesel fuel across the region. The Refinery's crude oil supply is derived primarily from Wyoming and Alberta, Canada.

14.     The Refinery employs nearly 270 people and covers approximately 720 acres. It processes roughly 60,000 barrels per day of crude oil and hundreds of volatile chemicals during the refining process to produce 450 million gallons of gasoline products and 200 million gallons of diesel fuel annually. In addition, customers depend on the Refinery for the production of various other products, including conventional gasoline blendstocks for blending with ethanol, Ultra Low Sulfur Diesel fuels, asphalt, butane and propane.

15.     A reliable electricity supply and delivery system is essential to the Refinery's operations. The Refinery operates on electric power, and runs continuously, 24 hours a day and seven days a week. Because of the nature of the refining process, the processing units and their attendant equipment have to be carefully operated, maintained and managed. Unplanned electrical interruptions that disturb the process units and equipment's normal planned functions can have a severe and cascading impact on the equipment and the refining process, resulting in immediate shutdowns and emergency safety situations. It could take several days or

longer to properly shut down and/or start up a major processing area after an electrical outage or interruption, particularly during the frigid winter months in Billings. Sophisticated refinery equipment is particularly sensitive to loss of power caused by sudden, unplanned and unexpected electrical power outages or electrical service interruptions, resulting in unanticipated shutdowns and equipment damage.

16.     Unplanned electrical outages can also compromise the safety of the employees and the community.  Unscheduled shutdowns can interrupt the process flow of volatile chemicals which create severe safety, health and environmental risks that have to be properly managed by the Refinery.  Power outages and electrical service interruptions affecting oil refining facilities can have catastrophic effects, including explosions and fires resulting in damage to property and risk of serious injury or death to individuals.  Electrical utilities, including NWE, are well aware of these risks. Furthermore, unanticipated shutdowns can also cause "flaring" (*i.e.*, releases of flammable gas by pressure relief valves during unplanned over-pressuring of refinery equipment) and air permit exceedances (when starting up Refinery equipment), which create environmental issues, apprehension throughout the surrounding community and additional scrutiny and inquiry from regulatory agencies.

17.     NWE currently delivers electric service to the Refinery, and has done so for decades.  The Refinery is one of NWE's largest customers.

### NWE's Historic Knowledge of the ExxonMobil Billings Refinery and its Power Supply

18.    Throughout the 1980's and 1990's, ExxonMobil experienced a number of total power outages (outage of both 50 kV sources), voltage dips, and losses of one of the NWE 50 kV lines as a result of problems on NWE's transmission system, including relay-setting problems and flow-through currents.  In the early 1990's, ExxonMobil remained concerned with improving the reliability of power supplied to the Refinery, particularly given the magnitude of the damage caused to the Refinery by power outages and service interruptions.  Subsequent to a total power outage in May 1994, ExxonMobil requested and NWE agreed to undertake an analysis of the power supply system to the Refinery.

19.    ExxonMobil is informed and believes that as part of this analysis, NWE identified certain electrical system concerns and recommended specific actions be taken to address those concerns in order to improve the reliability of the delivery of power to the Refinery.

20.    One of these concerns was that a single fault within one of the two City of Billings Sewer Plant substations could result in a loss of power on both NWE 50 kV circuits.  To address this issue, NWE recommended that it replace ground switches at the two City of Billings Sewer Plant substations with circuit switches and investigate

the arrangement of the distribution voltage switchgear at the City of Billings Sewer Plant.

21.    In addition, NWE concluded that it should immediately revise existing or prepare written operating and maintenance procedures, to minimize human errors and to maximize preventive maintenance benefits.

### NWE's Service Agreements with the ExxonMobil Billings Refinery

22.    NWE's provision of electric service to the Refinery is currently governed by a Service Agreement for Network Integration Transmission between NWE and ExxonMobil, effective August 1, 2013 ("Transmission Agreement").  The Transmission Agreement expressly requires NWE to provide network integration transmission services under NWE's FERC Electric Tariff, Sixth Revised Volume No. 5 ("Open Access Transmission Tariff" or "OATT").

23.    The Transmission Agreement obligates NWE to provide "Network Integration Transmission Service from [ExxonMobil's] Network Resources to serve Network Load," and "ancillary services" (defined as those services that are necessary to support the transmission of capacity and energy from resources to loads while maintaining reliable operation of NWE's transmission system in accordance with "Good Utility Practice"), pursuant to the OATT.  In addition, Rule 8 of NWE's Rules, which therefore form part of the Transmission Agreement, provides that "[NWE] shall make a ***reasonable effort to avoid interruptions of service***."

24.    NWE collects millions of dollars a year from ExxonMobil to provide power to the Billings Refinery.

25.    NWE delivers power to the Billings Refinery through two 50 kV lines, one running from the Rimrock Substation and the other from the Steam Plant Switchyard Substation, that are connected to a substation located at the Refinery known as the Billings ExxonMobil Substation.  These lines are the only sources of electrical power to any of the Refinery process units.  When neither of these sources of power are available, the Refinery has no alternative power supply to meet the needs of the Refinery.

26.    In addition to serving the Refinery, NWE's two 50 kV lines also serve other NWE customers, including the City of Billings Sewer Plant.

27.    Although NWE serves other customers off these lines, it is incumbent upon NWE to maintain exclusive control and security of its electrical delivery facilities and system so that the operation of such facilities cannot be taken over by any specific customer or third party to the detriment of any other NWE customer, including the Refinery.

## NWE's Failure to Maintain Security and Control Over its Power Delivery Facilities and System

28.    NWE has failed, and continues to fail, to maintain such control and security of its electrical delivery facilities and system.  NWE knows or should have

known that the design, construction, management, maintenance and operation of its equipment and facilities allows untrained, unsupervised and unauthorized non-NWE personnel to access and control NWE's power delivery system.  As a result of actions within the control of NWE, the Refinery has been negligently exposed to unnecessary safety risks and has suffered substantial financial damage.

29.    NWE has routinely allowed untrained, unsupervised and unauthorized City of Billings employees access to and control over NWE's power delivery system, with a reckless disregard for the significant consequences such third-party access and control may have on other NWE customers, including the Refinery.

30.    By failing to lock down its own facilities and operations, NWE has negligently allowed untrained, unsupervised and unauthorized City of Billings employees to take control over NWE's power delivery system and improperly interrupt the Refinery's power supply.

31.    Specifically, on January 25, 2014, a significant fault occurred on NWE's Rimrock circuit.  As a result, the Steam Plant Switchyard circuit was suddenly forced to become the sole source of power to the Refinery and the City of Billings Sewer Plant, resulting in a partial outage at the Billings Sewer Plant.

32.    By virtue of the access and control NWE had previously given to the City of Billings over NWE's electrical delivery facilities and system, an untrained City of Billings employee took over NWE's equipment\system and diverted power away from

the Refinery by transferring the fault from the Billings Rimrock line to the Billings

Steam Plant Switchyard line.

33.    Moreover, the protective relaying on its two 50 kV circuits that serve the

Refinery was installed and commissioned incorrectly in that NWE failed to

appropriately set/reset the factory "negative sequence" relay setting to an application

specific setting.

34.    NWE's negligent supervision, installation, construction, operation and

maintenance of its own equipment and system in this regard caused a complete

unplanned power failure at the Refinery which resulted in substantial damage to the

Refinery's equipment and production processes.

35.    The Refinery experienced a major power outage for approximately four

hours; approximately two hours of which with no power being supplied by either of the

50 kV lines.  The black-out caused a complete shut-down of the Refinery operations,

as well as damage to equipment.  The duration of the outage combined with the frigid

winter temperatures caused severe cooling down of the Refinery equipment, preventing

the Refinery from restarting operations after the power supply was re-established.

36.    In another incident that took place after the January 2014 incident, NWE's

negligent design, construction, management, maintenance and operation of its

equipment and facilities has also resulted in the failure of NWE's ring bus breakers

that supply power to the Refinery, causing other plant-wide power outages at the

Refinery.  The Refinery experienced a major power outage for approximately one hour and fifty minutes.  The black-out caused a complete shut-down of the Refinery operations, as well as damage to equipment.  It also caused a shut-down of the Refinery's co-generation facility.

## FIRST CAUSE OF ACTION

### (Negligence/Gross Negligence)

37.     ExxonMobil incorporates herein by reference the allegations set forth in Paragraphs 1 through 36 of this Complaint.

38.     NWE owed a duty to ExxonMobil to exercise reasonable care and caution in the design, construction, inspection, maintenance and operation of the electrical service delivered to the Refinery at a level or amount commensurate with the amount of harm that would foreseeably result from a power outage at the Refinery.  NWE cannot abrogate its duty to exercise reasonable care to avoid unnecessary risks of harm to ExxonMobil and the Refinery.

39.     ExxonMobil is informed and believes that NWE knew or should have known, based on its ongoing relationship with ExxonMobil and its longstanding provision of electrical service to the Refinery, that a reliable supply of electricity is imperative to avoid serious damage and loss of operation to the Refinery.  ExxonMobil is informed and believes that as early as 1994 NWE assured ExxonMobil that it was committed to providing a reliable supply of power to the Refinery.  In 1994, NWE

recommended that certain actions be taken to improve the reliability of service to the Refinery, including replacing equipment and conducting an investigation to ensure that a single fault within one of the two City of Billings Sewer Substations will not result in the loss of the NWE Billings Steam Plant Switchyard and the Billings Rimrock lines.

40.     Furthermore, ExxonMobil is informed and believes that NWE knew or should have known that the consequences of a power outage at a refinery are much more severe than those faced by ordinary electric customers.  Sophisticated refinery equipment is particularly sensitive to loss of power caused by electrical power outages or electrical service interruptions, resulting in unanticipated shutdowns.  Unscheduled shutdowns can damage not only refinery equipment, but they also compromise production, which affects profitability.  Moreover, unanticipated shutdowns can also create significant danger to the safety, health and environment of the Refinery's personnel and the surrounding communities, including explosions, fires, personal injury and death, and environmental releases resulting in regulatory exposure.

41.     ExxonMobil is informed and believes that NWE knew or should have known that its electrical system operations could be accessed, operated and controlled by untrained and unsupervised non-NWE personnel, and it failed to exercise reasonable care to prevent such access, operation and control.

42.     In addition, ExxonMobil is informed and believes that NWE knew or should have known that the protective relaying on its two 50 kV circuits that serve the

Refinery was installed and commissioned incorrectly in that NWE failed to appropriately set/reset the factory "negative sequence" relay setting to an application specific setting.

43.     ExxonMobil is also informed and believes that NWE knew or should have known that its breakers on a ring bus supplying power to the Refinery were faulty, and it failed to exercise reasonable care to prevent such equipment from failing.

44.     ExxonMobil is informed and believes that NWE knew or should have known that there was a significant risk that the Refinery would experience total losses of power under the circumstances described herein.

45.     ExxonMobil is informed and believes that NWE breached its duty of care to ExxonMobil by, *inter alia*:

a.     Failing to design, construct, inspect, maintain and operate the Rimrock and Billings Steam Plant Switchyard circuits in order to avoid unexpected power failures;

b.     Allowing unqualified and unsupervised non-NWE personnel, without first communicating with, and receiving approval from, NWE to access, operate and control NWE's power delivery system, and divert and turn off the Refinery's power without notice;

      c.     Failing to implement inspection and maintenance activities and failing to take reasonable corrective action to avoid unnecessary interruption in the operation of its Refinery-related facilities; and

      d.     Failing to exercise reasonable care in operating its system to avoid unreasonable risks of harm to ExxonMobil and its property.

46.     NWE's total lack of care and extreme disregard in addressing dangers of which it had actual and constructive notice constitute a failure to take reasonable steps to avoid harm to ExxonMobil amounting to negligence and gross negligence.

47.     ExxonMobil made a reasonable effort to minimize the damage caused by NWE's negligent provision of electrical service to the Refinery.

48.     However, as a direct, proximate and foreseeable result of NWE's conduct, ExxonMobil has suffered millions of dollars in damages including, but not limited to the following:

      a.     Costs and expenses to restore operations at the Refinery after the shutdowns that were caused by the power outages at issue herein;

      b.     Costs and expenses to repair the facilities at the Refinery after the shutdowns that were damaged as the result of the power outages at issue herein;

      c.     Costs and expense related to ExxonMobil's investigation of the power outages at issue herein; and

d.      Lost earnings and profits resulting from the decrease in production output at the Refinery caused by the power outages at issue herein.

49.     The exact amount of damages resulting from the losses of power will be proven at trial, but is far in excess of $75,000.

50.     The acts and omissions of NWE were deliberate, willful, oppressive, wanton and malicious, inasmuch as they were made in deliberate and/or reckless indifference to the high probability of damage to the Refinery by failing to take reasonable steps, precautions and/or remedial measures to prevent the incidents as set forth above, including allowing the control over its operations to drift to the City of Billings, which would have prevented the outage at the Refinery, and thereby justify an award of exemplary or punitive damages.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

51.     ExxonMobil incorporates herein by reference the allegations set forth in Paragraphs 1 through 50 of this Complaint.

52.     ExxonMobil entered into the written Transmission Agreement with NWE, effective August 13, 2013, for the provision of network integration transmission services.  Among other things, ExxonMobil agreed to pay NWE effective rate(s) applicable under the OATT for these services.  NWE in turn agreed to deliver, and did

deliver electrical power to the Refinery.  The Transmission Agreement is a valid contract between the refinery owner/operator, ExxonMobil, and NWE.

53.    The Transmission Agreement obligates NWE to provide "Network Integration Transmission Service from [ExxonMobil's] Network Resources to serve Network Load," and "ancillary services" pursuant to the OATT.

54.    In addition, Rule 8 of NWE's Rules, which therefore form part of the Transmission Agreement, provides that "[NWE] shall make a reasonable effort to avoid interruptions of service."  Rule 8 further provides that "[o]nly [NWE's] duly authorized employees or agents shall be permitted to connect [NWE's] facilities to Customer's service terminal."

55.    NWE had a contractual obligation to exercise reasonable care in delivering reliable power to the Refinery and to avoid unreasonable risks of harm to ExxonMobil and the Refinery.

56.    NWE breached its contractual obligations by, *inter alia*, failing to provide network transmission services to the Refinery, and failing to take reasonable actions to prevent untrained and unsupervised non-NWE personnel from accessing, operating and controlling NWE's 50 kV operations, so that a fault on the Billings Rimrock line could not be transferred to NWE's Billings Steam Plant Switchyard line, and failing to take reasonable actions to prevent the failure of NWE's breakers on a ring bus supplying power to the Refinery.

57.    NWE's breaches of the Transmission Agreement to deliver power in the NWE system to the Refinery resulted in sustained power outages at the Refinery.

58.    ExxonMobil has properly performed and complied with all terms and conditions under the Transmission Agreement, except for those terms and conditions which have been excused, prevented, waived, and/or released by NWE.

59.    ExxonMobil made a reasonable effort to minimize the damage caused by NWE's breaches of the Transmission Agreement.

60.    However, as a direct, proximate and foreseeable result of NWE's breaches of contract, ExxonMobil has suffered millions of dollars in damages including, but not limited to the following:

a.    Costs and expenses to restore operations at the Refinery after the shut-downs that were caused by the power outages at issue herein;

b.    Costs and expenses to repair the facilities at the Refinery that were damaged as the result of the power outages at issue herein;

c.    Costs and expenses related to ExxonMobil's investigation of the power outages at issue herein; and

d.    Lost earnings and profits resulting from the decrease in production output at the Refinery caused by the power outages at issue herein.

61.    The exact amount of damages resulting from the losses of power will be proven at trial, but is far in excess of $75,000.

## THIRD CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing)

62.     ExxonMobil re-alleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 61 of this Complaint.

63.     Implied in the Transmission Agreement between NWE and ExxonMobil is a common contractual covenant of good faith and fair dealing, which is a contractual term imposed by Montana law.

64.     ExxonMobil had a justifiable expectation that NWE would comply with the terms of the Transmission Agreement.

65.     NWE breached the implied covenant of good faith and fair dealing by unreasonably and intentionally allowing the City of Billings to access and control NWE's 50 kV operations, thereby allowing the City of Billings to divert and turn off the Refinery's power without notice, and by allowing NWE's breakers on a ring bus supplying power to the Refinery to fail with a blatant disregard of the consequences of NWE's actions on ExxonMobil's rights under the Transmission Agreement.

66.     NWE's breaches were the direct, proximate and foreseeable cause of ExxonMobil being damaged by not being delivered power to the Refinery.

67.     The exact amount of damages resulting from the losses of power will be proven at trial, but is far in excess of $75,000.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule 38.1, ExxonMobil respectfully demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, ExxonMobil prays for judgment against NWE as follows:

1.      For judgment in favor of ExxonMobil and against NWE;

2.      For compensatory damages according to proof;

3.      For consequential damages according to proof;

4.      For punitive and exemplary damages;

5.      For costs and interest as allowed by law; and

6.      For such other and further relief that this Court deems just and proper.

Dated this 22nd day of January, 2016.

CROWLEY FLECK PLLP


/s/ Jeffery J. Oven
Jeffery J. Oven
490 North 31st Street, Suite 500
P.O. Box 2529
Billings, MT  59103-2529
Tel:  (406) 252-3441
Fax:  (406) 252-5292
joven@crowleyfleck.com

Richard Casey
CROWLEY FLECK PLLP
1667 Whitefish Stage Rd., Ste 101
P.O. Box 759
Kalispell, MT  59903-0759
Telephone:  (406) 752-6644
Facsimile:  (406) 752-5108
rcasey@crowleyfleck.com

Jack S. Yeh (*Pro Hac Vice* Motion Forthcoming)
Ronald S. Cohen (*Pro Hac Vice* Motion Forthcoming)
Alexis Miller Buese (*Pro Hac Vice* Motion Forthcoming)
SIDLEY AUSTIN, LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA  90067
Telephone: (310) 595-9500
Facsimile:  (310) 595-9501
jyeh@sidley.com
rcohen@sidley.com
alexis.buese@sidley.com

John W. McGuinness (*Pro Hac Vice* Motion Forthcoming)
Erin C. Witkow (*Pro Hac Vice* Motion Forthcoming)
Tara Church (*Pro Hac Vice* Motion Forthcoming)
MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224
jmcguinness@manatt.com
ewitkow@manatt.com
tchurch@manatt.com

*Counsel for Plaintiff*